1

ERIC ANDREW MERCER, SBN 248707
MERCER LEGAL

2

770 L Street Suite 950
Sacramento, CA 95814

3

Telephone:     (916) 361-6022
Facsimile:     (916) 361-6023

4

Email:         mercerlegal@me.com

5

Attorney for Plaintiffs
RUSTY KROUSE, an individual; and BRENNA

6

KROUSE, an individual

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

10

11

RUSTY KROUSE, an individual; and
BRENNA KROUSE, an individual;

12

13

Plaintiffs,

14

v.

15

BAC HOME LOANS SERVICING, LP;
BANK OF AMERICA N.A.; and DOES 1

16

through 10, inclusive,
Defendants.

17

18

19

20

21

22

Case No. 2:10-cv-03309-MCE –EFB

**THIRD AMENDED COMPLAINT FOR:**

**1. BREACH OF WRITTEN CONTRACT (TPP)**
**2. BREACH OF ORAL CONTRACT (TPP)**
**3. BREACH OF GOOD FAITH AND FAIR DEALING**
**4. PROMISSORY ESTOPPEL**
**5. VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**6. VIOLATIONS OF TRUTH-IN-LENDING ACT AND REGULATION Z**

DEMAND FOR JURY TRIAL

UNLIMITED CIVIL ACTION

23

24

25

26

27

28

MERCER LEGAL

- 1 -

Plaintiffs, RUSTY KROUSE and BRENNA KROUSE ("Plaintiffs"), by and through counsel, for their Complaint against Defendants, pleads as follows:

**INTRODUCTION**

1.     Plaintiffs bring this lawsuit on two principal bases.  First, Plaintiffs challenge the failure of BAC HOME LOANS SERVICING, LP, a subsidiary of BANK OF AMERICA N.A., (collectively "Bank of America") to honor its Trial Period Plan ("TPP") agreements with Plaintiffs to modify their mortgage and prevent foreclosure under the United States Treasury's Home Affordable Modification Program ("HAMP").  Second, Plaintiffs brings this lawsuit for rescission, or a determination that Plaintiffs have properly rescinded any security interest held on their property, under TILA and Regulation Z.

2.     Under HAMP, participating servicers are required to consider all eligible mortgage loans unless prohibited investor servicing agreements and must use a uniform loan modification process to provide eligible borrowers with sustainable monthly payments.

3.     This uniform loan modification process is composed of three basic steps.

4.     First, the servicer must determine whether the borrower meets certain minimum eligibility requirements, such as whether the loan is a first lien, whether the loan is delinquent, whether the borrower resides on the property, and whether the property is the borrower's principal residence.

5.     Second, if the borrower meets all of the minimum eligibility requirements, the must be evaluated using a standardized net present value ("NPV") test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer ***must*** offer the modification.

6.     Third, if the NPV test is positive, the servicer must use a two-step process to modify the borrower's loan.  Step one involves providing a Trial Period Plan outlining the terms of the trial period, and step two involves providing the borrower with an Agreement that outlines the terms of the final modification.

7.     Following underwriting, NPV evaluation and a determination, based on verified

MERCER LEGAL

1  income, that a borrower qualifies for HAMP, servicers will place the borrower in a trial period

2  plan (TPP).

3       8.      The trial period is three months in duration and governed by terms set forth in the

4  TPP Notice. Borrowers who make all trial period payments timely and who satisfy all other trial

5  period requirements will be offered a permanent modification.

6       9.      Prior to June 1, 2010, servicers had a second option of placing a borrower into a

7  trial period plan based on verbal financial information obtained from the borrower, subject to later

8  verification during the trial period.  Under this option, a servicer may refuse to make the TPP

9  permanent only where the verbal information provided differs from the documentation provided

10  later.

11      10.     As a result, when Bank of America entered into the written agreement with

12  Plaintiffs (the TPP), it agreed to provide Plaintiffs with a permanent loan modification if

13  Plaintiffs made three monthly trial period payments.  Plaintiffs, for their part, complied with this

14  agreement by making payments.

15      11.     As further evidence that Plaintiffs complied with all the requirements of the

16  agreement, Bank of America sent a letter that they had met all of the requirements under the TPP

17  and would be offered a permanent modification.

18      12.     As further evidence that Plaintiffs complied with all of the requirements under the

19  TPP, Plaintiffs had multiple communications with Bank of America representatives who

20  confirmed that they were to receive a permanent modification.

21      13.     Despite Plaintiffs' efforts, Bank of America has ignored its contractual obligation

22  to permanently modify his loan.

23      14.     For these reasons, detailed below, Plaintiffs seek damages from Bank of America

24  and an order forcing Bank of America to permanently modify his loan in accordance with its

25  contractual obligation.

26      15.     Bank of America violated TILA and Regulation Z in connection with a loan

27  transaction with Plaintiffs.  Defendant Bank of American, upon information and belief, now holds

28  the promissory note at issue. Plaintiffs bring this First Amended Complaint pursuant to federal

MERCER LEGAL

1   law for rescission or a determination that Plaintiffs have properly rescinded any security interest

2   held on their Property (defined below) held by Defendants and to recover statutory penalties and

3   other damages as provided by law.

**JURISDICTION AND VENUE**

5   16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28

6   U.S.C. § 1441(b).

7   17.     Venue is proper in this Court because the subject real property is located in this

8   District.

**PARTIES**

10   18.     Plaintiff, RUSTY KROUSE is, and at all times mentioned herein was, over the age

11   of 18 and a resident of Sacramento County, California.

12   19.     Plaintiff, BRENNA KROUSE is, and at all times mentioned herein was, over the

13   age of 18 and a resident of Sacramento County, California.

14   20.     Plaintiffs own and reside at the real property commonly described as 6950 Elm

15   Tree Lane, Orangevale, California, 95662 (hereafter "the Property"). The Property is, and at all

16   relevant times was, Plaintiffs' principal and family residence.

17   21.     Plaintiffs are "consumers," as defined in TILA and Regulation Z.

18   22.     Defendant BANK OF AMERICA, N.A. ("BANK OF AMERICA"), is and at all

19   times relevant hereto was a mortgage lender headquartered in Charlotte, North Carolina, and

20   doing business in Sacramento County.

21   23.     Plaintiffs are informed and believe, and on that basis allege, that Bank of America

22   is a "creditor" with regard to the secured loan that is the subject of this action as defined in TILA

23   and Regulation Z (12 C.F.R. 226.23).

24   24.     Defendant BAC HOME LOANS SERVICING, LP (formerly known as

25   COUNTRYWIDE HOME LOANS SERVICING, LP) is a subsidiary of BANK OF AMERICA,

26   with its headquarters in Calabasas, California.

27   25.     The true names and capacities of DOES 1 through 10 are currently unknown to

28   plaintiffs who allege that DOES 1 through 10 are responsible in some manner for the injuries

MERCER LEGAL

- 4 -

1  sustained by all plaintiffs as hereinafter alleged. Plaintiffs request leave to file amendments to this

2  complaint alleging the true names and capacities of DOES 1 through 10 when the same have been

3  ascertained.

4      26.   Plaintiffs are informed and believe, and on that basis allege, that at all times herein

5  mentioned each of the Defendants was an agent, servant, employee, and/or joint venturer of each

6  of the remaining Defendants, and was at all times acting within the course and scope of such

7  agency, service, employment, and/or joint venture, and each Defendant has ratified, approved,

8  and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

9      27.   Defendants, and each of them, aided and abetted, encouraged, and rendered

10  substantial assistance to the other Defendants in breaching their obligations to Plaintiffs, as

11  alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the

12  commissions of these wrongful acts and other wrongdoings complained of, each of the

13  Defendants acted with an awareness of its/his/her primary wrongdoing and realized that

14  its/his/her conduct would substantially assist the accomplishment of the wrongful conduct,

15  wrongful goals, and wrongdoing.

16      28.   There is a unity of interest between Defendants, and each acts as the alter ego of

17  the other.

18                          **FACTS**

19                      ***The Foreclosure Crisis***

20      29.   The United States, and California in particular, are in the midst of the worst

21  foreclosure crisis since the Great Depression due largely to reckless and abusive lending practices

22  of the previous two decades that lead to approximately 2 million subprime foreclosures.

23  Ultimately spreading from the subprime to the prime sectors, catalyzing a housing-lead recession,

24  and triggering historic levels of unemployment. There have already been more than 2.5 million

25  homes lost, and Wall Street analysts recently predicted there could be as many as 11 million more

26  foreclosures filed (*See* "Testimony of Julia Gordon, Center for Responsible Lending Before the

27  Congressional Oversight Panel, HAMP, Servicer Abuses, and Foreclosure Prevention Strategies,"

28

MERCER LEGAL

THIRD AMENDED COMPLAINT

October 27, 2010[1]).

30.     Across the country, foreclosures rates have hit an all-time high, with nearly one in ten homes with a mortgage currently in some stage of foreclosure. According to Realty Trac's Midyear 2010 U.S. Foreclosure Market Report, in the first six months of 2010, 1,654,634 U.S. properties, or one in every 78 homes in the U.S., received a foreclosure filing.[2]

31.     In California the situation is even grimmer, with nearly one in eight—or approximately 702,000—homes currently in foreclosure.  California ranks fourth in the United States in the rate at which mortgages that are seriously delinquent, defined as 90 days or more delinquent or in foreclosure, behind Florida, Nevada, and Arizona. According to the Midyear 2010 U.S. Foreclosure Market Report, California had the highest number of foreclosures foreclosures filings in the United States, with 340,740 properties or one in every 39 homes in California receiving such a filing. In July 2010, California accounted for 21 percent of the nation's total foreclosure filings, with 66,910 properties receiving a foreclosure filing during the month.[3]

32.     The Sacramento region and California's Central Valley have been particularly hit hard by the foreclosure crisis. Sacramento posted the fourteenth highest metro foreclosure rate in the first half of 2010.   In addition, Modesto, Merced, and Stockton all ranked in the top ten.[4]

33.     California's foreclosure crisis shows little sign of abating. The state's housing crisis has devastated the economy and its unemployment rate now stands at 12.3 percent. The high level of unemployment only serves to increase mortgage defaults, thereby contributing to a negative cycle where unemployment exacerbates the foreclosure epidemic, which, in turn, exerts downward pressure on the economy and elevates unemployment (*See* "Foreclosures by Race and Ethnicity: The Demographics of a Crisis, CRL Research Report, June 18, 2010" ("CRL Report"

[1] http://www.responsiblelending.org/mortgage-lending/policy-legislation/congress/testimony-julia-gordon-10-26-2010.pdf last visited June 21, 2011.
[2] http://www.realtytrac.com/content/foreclosure-market-report/165-million-properties-receive-foreclosure-filings-in-first-half-of-2010-5877
[3] http://www.realtytrac.com/content/foreclosure-market-report/foreclosure-activity-increases-4-percent-in-july-5946
[4] http://www.realtytrac.com/content/foreclosure-market-report/75-percent-of-nations-top-metro-areas-post-increasing-foreclosure-activity-in-first-half-of-2010-5903

MERCER LEGAL

THIRD AMENDED COMPLAINT

1  at 4))[5].

2      34.    The damage resulting from foreclosures is multifaceted. First, there are the

3  immediate and direct impacts on families associated with the disruption and upheaval of eviction.

4  The detrimental consequences that forced displacement can have on children's education and a

5  family's health and employment are significant. Second, there is the loss of wealth that

6  homeownership typically provides. Homeownership has been the primary source of economic

7  mobility and financial security in this country. Home equity is often tapped to start a new

8  business, pay for higher education and secure retirement. In addition, home equity provides a

9  financial cushion against unexpected financial hardships, such as job loss, divorce or medical

10  expenses. Homeownership is also the primary means by which wealth is transferred to future

11  generations. The foreclosure crisis therefore threatens the financial stability and mobility of

12  families across the country, not just now but also in the future. *Id.*

13      35.    In addition to the devastation caused to individuals and families who directly lose

14  their homes, foreclosures have broader negative impacts on communities. Homeowners who live

15  near foreclosed properties experience depreciated home values.  Moreover, communities with

16  high concentrations of foreclosures lose tax revenue while incurring the financial and non-

17  financial costs of abandoned properties and neighborhood blight.  *Id.*

18      36.    Foreclosure is, without question, the worst outcome for both borrowers and

19  investors. It is a long and drawn-out process in which an investor typically suffers a loss on his

20  investment in the mortgage loans of between 50-80% of the balance of the loan amount after the

21  home is sold and the various costs are deducted (*See* 5/12/2011 Testimony of Laurie Goodman,

22  Amherst Securities Group to the Subcommittee on Housing, Transportation and Community

23  Development ("Goodman Testimony").[6]

24                  *Creation of the Home Affordable Modification Program*

25      37.    To mitigate against devastation resulting from mass foreclosures, the federal

26

27  [5] http://www.responsiblelending.org/mortgage-lending/research-analysis/foreclosures-by-race-and-ethnicity.pdf last
visited June 21, 2011.

28  [6] http://banking.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=484c5b2b-6924-459f-898e-
3ae075feeb15 last visited June 21, 2011.

THIRD AMENDED COMPLAINT

MERCER LEGAL

1    government has instituted several policies over the past several years to ensure that the lending

2    banks – including those that have received billions of dollars in taxpayer bailouts – give

3    homeowners every reasonable opportunity possible to stay in their homes.

4          38.     Congress passed the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §

5    5201 *et seq.*, on October 3, 2008, and amended it with the American Recovery and Reinvestment

6    Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, on February 17, 2009 (together, the "Act").

7          39.     The purpose of the Act was to grant the Secretary of the Treasury the authority to

8    restore liquidity and stability to the financial system, and to ensure that such authority is used in a

9    manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

10          40.     The Act granted the Secretary of the Treasury the authority to establish the

11    Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211 *et seq*. Under TARP, the Secretary

12    may purchase or make commitments to purchase troubled assets from financial institutions. *Id*.

13          41.     Congress allocated up to $700 billion to the Treasury for TARP. 12 U.S.C. § 5225.

14          42.     In exercising its authority to administer TARP, the Act mandates that the Secretary

15    "shall" take into consideration the "need to help families keep their homes and to stabilize

16    communities." 12 U.S.C. § 5213(3).

17          43.     The Act further mandates, with regard to any assets acquired by the Secretary of

18    the Treasury that are backed by residential real estate, that the Secretary "shall implement a plan

19    that seeks to maximize assistance for homeowners" and use the Secretary's authority over

20    servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.

21    § 5219.

22          44.     The Act grants authority to the Secretary of the Treasury to use credit

23    enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable

24    foreclosures." *Id*.

25          45.     On February 18, 2009, pursuant to their authority under the Act, the Treasury

26    Secretary and the Director of the Federal Housing Finance Agency created the Making Home

27    Affordable ("MHA") initiative to help at-risk homeowners avoid foreclosure by restructuring

28    their mortgages.

MERCER LEGAL

46.     The Home Affordable Modification Program, or HAMP, is the portion of the MHA initiative that provides mandatory directives for implementation, and with which Bank of America has not complied. HAMP creates a uniform loan modification protocol, and provides financial incentives for participating servicers to modify loans. The Treasury Department has allocated at least $75 billion in federal funds to HAMP, of which at least $50 billion is TARP money, to keep up to "3 to 4 million homeowners" in their homes by 2012.

### Bank of America's Obligations Under HAMP

47.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans. Defendant BAC Home Loans Servicing and Bank of America are servicers and its actions described herein were made as agents for the entities that hold mortgage loans.

48.     Because Bank of America accepted $45 billion in federal funds and additional loan guarantees, it was and is required to participate in HAMP for the loans on which it functions as a loan "servicer." Steve R. Bailey, of Bank of America, executed a Servicer Participation Agreement ("SPA" attached hereto as "**Exhibit 1**") with the federal government on April 17, 2009, making official Bank of America's participation in HAMP, and binding it to comply with the HAMP procedures.

49.     The SPA executed by Mr. Bailey explicitly incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with HAMP. These documents together are referred to as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." SPA I.A., 2.A.5

50.     Fannie Mae issued the first "Supplemental Directive" ("SD 09-01" attached hereto as "**Exhibit 2**") in April 2009. That Directive, together with others issued since, sets out the uniform loan modification process which Bank of America must perform "for all mortgage loans

MERCER LEGAL

it services." (SPA § 2.A.)

51.     The Treasury intended that HAMP merely reflect usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations.  (SD 09-01, page 1).

52.     The uniform loan modification process (HAMP) that reflects the usual and customary industry standards is currently governed by the Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, Version 3.0 (as of December 2, 2010) (the "MHA Handbook" attached hereto as **Exhibit 3**").  While the HAMP rules are extensive, the three basic steps to determine whether a borrower is offered a modification are simple and have always been the same under HAMP.

53.     First, Bank of America must determine whether the borrower meets certain minimum eligibility requirements (SD 09-01 at 1-2, MHA Handbook at 41-44).

54.     Next, the servicer is required to a standardized net present value ("NPV") test that compares the NPV result for a modification to the NPV result for no modification (SD 09-01 at 4; MHA Handbook at 73). Using the standard modification waterfall, if the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer must offer the modification.  *Id.*

55.     Finally, the servicers must Servicers must use a two-step process for HAMP modifications (SD 09-01 at 14). Step one involves providing a Trial Period Plan outlining the terms of the trial period, and step two involves providing the borrower with an Agreement that outlines the terms of the final modification. *Id.*

56.     Step one, the TPP, occurs after underwriting, NPV evaluation and a determination, based on verified income, that a borrower qualifies for HAMP (SD 09-01 at 5-6, MHA Handbook at 77).  Prior to June 1, 2010, servicers had the option to use verbal financial information obtained from the borrower to assess the borrower's eligibility (SD 09-01 at 5).  *Id.*  The servicer could rely on this information to prepare and send to the borrower a solicitation for the HAMP and an offer of a Trial Period Plan.  *Id.*  When the borrower returns the Trial Period Plan and related

MERCER LEGAL

- 10 -

1   documents, the servicer must review them to verify the borrower's financial information and

2   eligibility. *Id*. But the three basic steps remain the same under either option (SD 09-01 at 5-6).

3        57.    Upon receipt of the Trial Period Plan from the borrower, the servicer must confirm

4   that the borrower meets the underwriting and eligibility criteria (SD 09-01 at 15). Once the

5   servicer makes this determination and has received good funds for the first month's trial payment,

6   the servicer should sign and immediately return an executed copy of the Trial Period Plan to the

7   borrower. *Id.*

8        58.    Plaintiffs are informed and believe, and on that basis allege, that under the usual

9   and customary industry standards at the time in question, servicers failed to return an executed

10  copy of the TPP to borrowers.

11       59.    Plaintiffs are informed and believe, and on that basis allege, that under the usual

12  and customary policies and procedures of Defendants at the time in question, Defendants failed to

13  return an executed copy of the TPP to borrowers.

14       60.    The trial period is three months in duration and governed by terms set forth in the

15  TPP Notice. Borrowers who make all trial period payments timely and who satisfy all other trial

16  period requirements **will** be offered a permanent modification. (SD 09-01 at 17-18; SD 10-01 at 8

17  attached hereto as "**Exhibit 4**"; MHA Handbook at 77).

18       61.    Step two, the permanent modification, must be offered if the homeowner makes all

19  the TPP monthly payments and complies with documentation requirements (SD 09-01 at 18; SD

20  10-01 at 8; MHA Handbook at 80).

21                    ***Notice of Non-Compliance with TPP***

22       62.    On December 23, 2009, the Treasury Department issued Supplemental Directive

23  09-10 ("SD 09-10" attached hereto as "**Exhibit 5**"), to "provide servicers an opportunity to

24  remain focused on converting eligible borrowers to permanent HAMP modifications . . . ."

25       63.    Under SD 09-10, servicers could not cancel an active HAMP trial modification

26  during this period for any reason other than failure to meet the HAMP property eligibility

27  requirements.

28       64.    Under SD 09-10, servicers were directed to confirm the status of borrowers in

MERCER LEGAL

active HAMP trial modifications scheduled to expire on or before January 31, 2010 as either current or not current. Servicers were to also confirm which, if any, documents are due from borrowers. *Id*.

65.     Servicers were also to send written notification to borrowers as appropriate to inform them that they are at risk of losing eligibility for a permanent HAMP modification because the borrower has (i) failed to make all required trial period payments, (ii) failed to submit all required documentation, or (iii) both. *Id*.

66.     Under SD 09-10, the notice must provide the borrower with the opportunity to correct any error in the servicer's records or submit any missing documents or payments within 30 days of the notice or through January 31, 2010, whichever is later.  If a borrower provides evidence of the servicer's error or corrects the deficiency within the timeframe provided, the servicer must consider the new information and determine if the borrower is eligible to continue in the HAMP modification process. *Id*.

### Bank of America's Obligations Under 2MP

67.     On August 13, 2009, Treasury published Supplemental Directive 09-05, introducing the Second Lien Modification Program (referred to as "2MP" attached hereto as "**Exhibit 6**") designed to work in tandem with HAMP.

68.     Under 2MP, when a borrower's first lien is modified under HAMP and the servicer of the second lien is a 2MP participant, that servicer must offer to modify the borrower's second lien according to a defined protocol, to accept a lump sum payment from Treasury in exchange for full extinguishment of the second lien, or to accept a lump sum payment from Treasury in exchange for a partial extinguishment and modify the remaining borrower's second lien according to a defined protocol. (SD 09-05 Revised at 1.)

69.     When a borrower's first lien is modified under HAMP, a participating second lien servicer must offer to modify the borrower's second lien according to a defined protocol. In addition, if the borrower's first lien is modified under HAMP, a participating second lien servicer must dismiss any outstanding foreclosure action on the borrower's second lien. (SD 09-05 Revised at 3.)

MERCER LEGAL

- 12 -

*Rusty and Brenna Krouse's Experience with Bank of America*

70.    Like so many other Californians, Plaintiffs' business suffered as a result of the housing crisis and its affect on the broader economy.  Plaintiffs own and operate a general and electrical contracting business that suffered due to the building decline in the national, and especially the local, housing market.

71.    As a result, Plaintiffs began having difficulty making their full mortgage payment.

72.    Plaintiffs applied for a loan modification in accordance with HAMP Guidelines in April 2009.

73.    Plaintiffs provided the financial information requested by Bank of America many times over the next several months.

74.    In July 2009, Bank of America informed Plaintiffs in a telephone conversation that they and were deemed eligible by Bank of America to receive a permanent modification in accordance with HAMP.  Bank of America stated further that the amount of their payment would be $2,345.  Bank of America stated further that this amount included principal, interest, taxes, and insurance.  Bank of America explained that Plaintiffs need only make three trial period plan payments of $2,345, then Bank of America would provide a permanent modification.

75.    On or about August 23, 2009, Plaintiffs received a written Trial Period Plan ("TPP" attached hereto as **Exhibit 7**") in accordance with HAMP (entitled "Home Affordable Modification Program Loan Workout Plan).

76.    Under the written TPP, Plaintiffs were required to make three Trial Period Payments in August, October, and November of 2009.  Under Paragraph number 3 of the written TPP, the modification becomes permanent after November provided Plaintiffs made all three Trial Period Payments and the representations made in the HAMP application remain true in all material respects.

77.    On or about August 20, 2009, Plaintiffs made the first payment required under both the oral TPP and the written TPP (for September 2009)

78.    On or about September 22, 2009, Plaintiffs made the second payment required under the oral TPP and written TPP (for October 2009).

MERCER LEGAL

79.     On or about October 27, 2009, Plaintiffs made the third and ostensibly the final payment under both the oral TPP and the written TPP (for November 2009).

80.     In November 2009, Plaintiffs waited anxiously for Bank of America to send the permanent modification paperwork.   Bank of America failed to provide the permanent modification paperwork by the end of November.

81.     On or about December 1, 2009, Plaintiffs contacted Bank of America to inquire why the permanent modification paperwork had not been sent.   Bank of America informed Plaintiffs that the paperwork was "still under review" and that Plaintiffs must continue to make payments.   In accordance with this instruction, Plaintiffs continued making payments through July 2010, or eight months after the modification should have been made permanent under HAMP requirements.

82.     On or about December 15, 2009, Plaintiffs received a letter dated December 12, 2009, from Bank of America requesting Plaintiffs' tax returns and the most recent profit and loss statement.   Although Plaintiffs submitted, prior to issuance of the oral and written TPPs, a profit and loss, tax returns, and IRS Form 4506-T, Plaintiffs provided — again — the information requested.

83.     On or about January 14, 2010, Plaintiffs received a letter dated January 11, 2010, from Gabriel Del Valle of Bank of America requesting tax returns, a letter stating that Plaintiffs do not pay homeowners association dues, and a letter showing completion of credit counseling. Although Plaintiffs previously provided the tax returns and IRS Form 4506-T, Plaintiffs provided the requested information — again.

84.     On or about January 27, 2010, Plaintiffs received a letter dated January 27, 2010, claiming that Plaintiffs have only made two of five required payments under the TPPs.   On or about January 28, 2010, Plaintiffs requested and then received by facsimile a loan history of detailed outlined of transactions from Bank of America showing that Plaintiffs had made payments each month since the Trial Period began.

85.     On or about February 2, 2010, Plaintiffs received a letter date January 30, 2010, from Bank of America requesting Plaintiffs tax returns.  On or about February 17, 2010, Plaintiffs

- 14 -

MERCER LEGAL

1  contacted Bank of America representative Ilene (Identification Number 7633) who stated that no

2  further information was needed.

3       86.     On or about February 2, 2010, Plaintiffs contacted Bank of America representative

4  Chasity (Identification Number 3108) who confirmed that Bank of America required no further

5  information and that Bank of America was still in the process of reviewing Plaintiffs'

6  information.

7       87.     On or about March 25, 2010, Plaintiffs contacted Bank of America representative

8  Jeremy (Identification Number 2427) who informed Plaintiffs that they had satisfied all of the

9  requirements of been approved for permanent modification in February and that they should

10  receive a Federal Express package in April containing the permanent modification.

11      88.     On or about April 3, 2010, Plaintiffs received a letter dated March 30, 2010, from

12  Bank of America informing them that they qualified for a permanent modification and that Bank

13  of America would send it to them soon.  This letter also encouraged Plaintiffs to continue making

14  their monthly mortgage payments or risk further negative impacts to their credit (attached hereto

15  as "**Exhibit 8**").

16      89.     On or about April 12, 2010, Plaintiffs received a letter from Bank of America

17  letter stating, "[t]he cancellation of lien for your mortgage is in the process of completion."

18      90.     On or about June 8, 2010, Plaintiffs contacted Bank of America representative

19  Vanessa (Identification Number 9548) who informed Plaintiffs that she could not tell them why

20  the permanent modification paperwork had not been sent out.  Plaintiffs requested to speak with a

21  manager.  Vanessa stated that no manager was available at that time, but that manager Ernest

22  Quinonez would contact Plaintiffs in a few days.  Plaintiffs never received any such contact.

23      91.     On or about June 25, 2010, Plaintiffs received a letter dated June 18, 2010, from

24  Bank of America informing them that they did not qualify for a HAMP modification due to a

25  negative NPV result.  On or about June 29, 2010, Plaintiffs contacted Bank of America

26  representative Sandy (Identification Number NBKSSXR) who confirmed that Plaintiffs had been

27  approved on February 9, 2010.  Plaintiffs requested the values used to determine the NPV results.

28  Sandy informed Plaintiffs that someone would contact Plaintiffs within 10 business days.

- 15 -

MERCER LEGAL

1   Plaintiffs never received that contact, nor did they receive the input values used to determine the

2   NPV.

3       92.     Instead of responding to Plaintiffs inquiries regarding the values used to determine

4   the NPV results, Bank of America began a series of automated and harassing telephone

5   "collection calls" numerous times per day that caused Plaintiffs emotional distress and interfered

6   with the normal operation of Plaintiffs' business.

7       93.     Exasperated and suffering from severe emotional distress, Plaintiffs, through

8   counsel, sent a "cease and desist" letters to Bank of America directing Bank of America to stop

9   the "collection calls" and to contact their counsel regarding their options to avoid foreclosure.

10      94.     On October 5, 2010, Plaintiffs, through counsel, sent a "cease and desist" letter via

11  facsimile to (805) 520-5019.

12      95.     On October 5, 2010 at 1:51 p.m., Plaintiffs received another "collection call."

13  When Plaintiffs attempted to answer the call, Bank of America terminated the call.

14      96.     On October 6, 2010 at 8:34 a.m. Plaintiffs received another call from Bank of

15  America via an automated dialing system.  When Plaintiffs answered the call an automated voice

16  instructed Plaintiffs to call Bank of America.

17      97.     On October 7, 2010 at 9:26 a.m., Plaintiffs received another "collection call."

18  When Plaintiffs attempted to answer the call Bank of America terminated the call.

19      98.     On October 7, 2010 at 11:16 a.m., Plaintiffs received a call from Bank of America

20  and spoke to Bank of America representative LaToya (Identification Number 6607).  LaToya

21  informed Plaintiffs that she was a debt collector and that any information that Plaintiffs provided

22  would be used to collect a debt.  She further informed Plaintiffs that they were eleven payments

23  past due and that a Notice of Intent to Accelerate "expires" on October 17, 2010.  LaToya

24  provided Plaintiffs no information regarding the NPV values used to determine the NPV result.

25  Plaintiffs directed Bank of America to contact their counsel regarding their options to avoid

26  foreclosure.  Bank of America failed to contact counsel to discuss options to avoid foreclosure on

27  this occasion and every other occasion.

28      99.     On November 1, 2010, Plaintiffs received a call from Bank of America

MERCER LEGAL

1   representative Melissa (Identification number 9731).   Melissa informed Plaintiffs that they are

2   now twelve payments past due and demanded to know whether Plaintiffs could make a payment.

3   Plaintiffs again provided counsel's contact information and asked Bank of America to contact

4   Plaintiffs' counsel regarding their options to avoid foreclosure.   Melissa informed Plaintiffs that

5   she was a debt collector and that any information that Plaintiffs provided would be used to collect

6   a debt.   Melissa provided no information regarding the NPV values used to determine the NPV

7   result.   Bank of America failed to contact Plaintiffs' counsel to discuss options to avoid

8   foreclosure.

9          100.   On or about November 5, 2010, Plaintiffs received a "collection letter" dated

10  November 1, 2010, from Bank of America despite the fact that Bank of America received

11  Plaintiffs request to cease all collection contacts on October 5, 2010.   In this letter Bank of

12  America states, "this communication is from a debt collector" (attached hereto as "**Exhibit 9**").

13         101.   On November 7, 2010, Plaintiffs received a call from Bank of America

14  representative AJ (Identification Number 9364). AJ informed Plaintiffs that he was a debt

15  collector and that any information that Plaintiffs provided would be used to collect a debt. AJ

16  demanded Plaintiffs make a payment. Plaintiffs again requested that Bank of America cease

17  contacts and contact their counsel. AJ asked Plaintiffs if the property was occupied, information

18  that Plaintiffs have provided to Bank of America numerous times in the past and information that

19  has been verified by representatives of Bank of America by physical inspection of the property on

20  at least two occasions. Plaintiffs again asked Bank of America to cease contacts and to contact

21  their counsel.  Instead of complying with Plaintiffs' request to end the call, AJ asked if Plaintiffs

22  have been advised to talk to HUD and that he would not cease the phone call because he "needed

23  to get these answers regardless of whether Plaintiffs were working with an attorney."   Plaintiffs

24  again requested that Bank of America cease contacts and that all further contact should occur

25  through her counsel.  Bank of America failed to contact Plaintiffs' counsel to discuss their options

26  to avoid foreclosure.

27         102.   Bank of America's harassing collection practices continue unabated despite

28  confirmation that Bank of America received a letter requesting Bank of America "cease and

- 17 -

1    desist" collection efforts on October 5, 2010.  On November 9, 2010, at 8:28 p.m. Plaintiffs again

2    received an automated "collection call" from Bank of America. When Plaintiffs attempted to

3    answer the call, Bank of America terminated the call.

4                    ***Facts Related to Plaintiffs' Claim For Rescission***

5            103.    Plaintiffs own the Property, which is Plaintiffs' principal and family residence.

6            104.    Prior to entering into the loan transaction with Bank of America, the Property was

7    subject to a promissory note secured by a deed of trust with Wells Fargo Home Loans in the

8    approximate amount of $116,179.48.  The intent of the transaction was to pay in full the Wells

9    Fargo Home Loans promissory note secured by a deed of trust on the property and to pay in full a

10   promissory note secured by a second deed of trust on the property to a third party not subject to

11   this action (to "refinance").

12           105.    On or about December 17, 2007 Plaintiffs were presented with loan documents to

13   sign at Placer Title Company at their Folsom, California office. Plaintiffs signed several loan

14   documents, including Promissory Notes securing both a first and second lien in favor of Bank of

15   America and  Deeds of Trust listing Bank of America as the lender, which was later recorded

16   securing Plaintiffs' obligations under said Promissory Notes.

17           106.    While at the offices of Placer Title Company on December 17, 2007, Plaintiffs

18   received a pre-copied set of Loan documents, all unsigned.

19           107.    Included in this set of the Loan documents were two Notice of Right To Cancel

20   forms (attached hereto as "**Exhibit 10**") with printed dates of December 17, 2007, as the date of

21   the transaction. Neither of the forms indicates when the borrower's right to cancel expires.

22   Neither of these forms indicates the last day on which Plaintiffs could exercise their right to

23   rescind the Loan.

24           108.    To obtain the Loan, Plaintiffs paid transaction fees and broker fees totaling

25   approximately $8,570.16.

26           109.    Pursuant to TILA, an assignee of a creditor's interest is liable for rescission to the

27   same extent as the assignor (15 USC section 1641(c): "[a]ny consumer who has the right to

28   rescind a transaction under section 1635 of this title may rescind the transaction as against any

MERCER LEGAL

1  assignee of the obligation.").

2  110.    On November 23, 2010, Plaintiffs, through their attorney, sent notice of their

3  rescission of the loan to Countrywide.

4  111.    Since that time, Bank of America has denied the valid rescission of this loan under

5  the federal Truth-in-Lending Act.

6  **CAUSES OF ACTION**

7  **FIRST CAUSE OF ACTION**

8  **BREACH OF WRITTEN CONTRACT**

9  **(Against All Defendants)**

10  112.    Plaintiffs reallege each and every allegation above as if fully set forth in this Cause

11  of Action.

12  113.    Plaintiffs entered into a written Trial Period Plan ("TPP") contract with Bank of

13  America (*See* "**Exhibit 7**").  Bank of America made the TPP offer through a formal TPP contract.

14  Plaintiffs formed binding and enforceable agreements when they executed the written TPP

15  contract, and/or when they made payments under the written TPP. Payments in accordance with

16  an executed TPP contract or TPP offer constitute consideration. In the alternative, the TPP

17  contracts or offers, coupled with Plaintiffs' payments, constitute an implied contract.

18  114.    Bank of America failed to perform under the TPP contract with Plaintiffs. Bank of

19  America's refusal to perform its duties under the TPP contract was unlawful, without justification

20  and/or excuse, and constituted a total and material breach of the TPP contract between the parties.

21  115.    Bank of America breached the written TPP contract with Plaintiffs by failing to

22  offer Plaintiffs permanent HAMP modifications after payment of the trial period payments.

23  116.    Plaintiffs gave consideration that was fair and reasonable, and have performed all

24  conditions, covenants, and promises required to be performed under their contracts with Bank of

25  America.

26  117.    As a result of Bank of America's breach of the written TPP contract, Plaintiffs

27  suffered and will continue to suffer reasonable and foreseeable consequential damages resulting

28  from such breaches, including payment of increased interest, longer loan payoff time, higher

MERCER LEGAL

- 19 -

1  principle balance, deterrence from seeking other remedies to address their default and/or

2  unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and

3  expenses incurred to prevent or fight foreclosure, and other damages for breach of contract.

4      118.    Plaintiffs have been damaged by Bank of America's breach of the written TPP

5  contract in an amount to be proven at trial.

6      WHEREFORE, plaintiffs pray for relief as set forth below.

7                    **SECOND CAUSE OF ACTION**

8                 **BREACH OF ORAL CONTRACT**

9                    **(Against All Defendants)**

10     119.    Plaintiffs reallege each and every allegation above as if fully set forth in this Cause

11  of Action.

12     120.    The actions of the parties as detailed in this Complaint, even if there were no

13  written TPP agreement, which there is, also constitute an oral contract.  Plaintiffs entered into an

14  oral Trial Period Plan ("TPP") contract with Bank of America. Bank of America made an oral

15  TPP offer to Plaintiffs. Plaintiffs formed binding and enforceable agreements when they made

16  payments under the TPP offered orally by Defendants. Payments in accordance with the oral TPP

17  offer constitute consideration. In the alternative, the oral TPP contract or offer, coupled with

18  Plaintiffs' payments, constitute an implied contract.

19     121.    Bank of America failed to perform under the oral TPP contract with Plaintiffs.

20  Bank of America's refusal to perform its duties under the oral TPP contract were unlawful,

21  without justification and/or excuse, and constituted a total and material breach of the oral TPP

22  contracts between the parties.

23     122.    Bank of America breached the oral TPP contract with Plaintiffs by failing to offer

24  Plaintiffs a permanent HAMP modification after payment of the trial period payments.

25     123.    Plaintiffs gave consideration that was fair and reasonable, and have performed all

26  conditions, covenants, and promises required to be performed under their contract with Bank of

27  America.

28     124.    As a result of Bank of America's breach of the oral TPP contract, Plaintiffs

MERCER LEGAL

1  suffered and will continue to suffer reasonable and foreseeable consequential damages resulting

2  from such breaches, including payment of increased interest, longer loan payoff time, higher

3  principle balance, deterrence from seeking other remedies to address their default and/or

4  unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and

5  expenses incurred to prevent or fight foreclosure, and other damages for breach of contract.

6       125.   Plaintiffs have been damaged by Bank of America's breach of the oral TPP

7  contracts in an amount to be proven at trial.

8            WHEREFORE, plaintiffs pray for relief as set forth below.

9                        **THIRD CAUSE OF ACTION**

10        **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

11                      **(Against All Defendants)**

12      126.   Plaintiffs reallege each and every allegation above as if fully set forth in this Cause

13  of Action.

14      127.   Under common law, a covenant of good faith and fair dealing is implied in every

15  contract, including the written and oral TPP contracts described above, which prevents one

16  contracting party from unfairly frustrating the other party's right to receive the benefits of the

17  contract. Bank of America is obligated to act in good faith and deal fairly with each borrower

18  who entered into a TPP contract.

19      128.   Bank of America has violated and continues to violate this covenant of good faith

20  and fair dealing in its TPP contracts with Plaintiffs by doing, *inter alia*, the following:

21          (a)    Failing to perform loan servicing function consistent with industry

22          standards;

23          (b)    Failing to perform loan servicing functions consistent with its

24          responsibilities to Plaintiffs;

25          (c)    Failing to properly supervise its agents and employees, including without

26          limitation, its loss mitigation and collection personnel, foreclosure personnel, and

27          personnel implementing its modification programs;

28          (d)    Failing to permanently modify loans and/or provide alternatives to

- 21 -

THIRD AMENDED COMPLAINT

MERCER LEGAL

foreclosure and using unfair means to keep Plaintiffs in temporary modification contracts, including, without limitations, routinely demanding information it already has and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications; and

(e)     Making inaccurate calculations and determinations of Plaintiffs' eligibility for trial or permanent modification.

129.     As a result of Bank of America's breach of this implied covenant, Plaintiffs suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including payment of increased interest, longer loan payoff times, higher principle balances, and other damages for breach of contract.

130.     Plaintiffs remain ready, willing, and able to enter into a permanent HAMP modification.

131.     Plaintiffs have been damaged by Bank of America's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

WHEREFORE, plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

#### (Against All Defendants)

132.     Plaintiffs reallege each and every allegation above as if fully set forth in this Cause of Action.

133.     Bank of America, by way of the TPP contracts described above, made a representation to Plaintiffs that if they agreed to the terms of a TPP proposal, either by returning an executed TPP Contract, or making the proposed trial payments, they would receive a permanent HAMP modification.

134.     Bank of America's TPP contracts were intended to induce Plaintiffs to rely on them and make monthly TPP payments.  Plaintiffs did, indeed, rely on Bank of America's representations, by submitting TPP payments. Plaintiffs' reliance was reasonable.

135.     Plaintiffs' reliance was to their detriment. For example, by complying with the

MERCER LEGAL

TPP contract but still being denied a permanent modification, Plaintiffs lost the opportunity to pursue other strategies and has lost the opportunity to fund other strategies to deal with his default and avoid foreclosure (e.g. by borrowing money to pay the default amount or by locating a potential buyer for the house that will allow Plaintiffs to remain at the home in exchange for rent or other arrangements), suffered harm in the form of higher loan balances, late charges, foreclosure-related servicing fees, potential income tax liability, and negative credit consequences.

136.    Plaintiffs have been damaged by Bank of America's actions and representations in an amount to be proven at trial.

WHEREFORE, plaintiffs pray for relief as set forth below.

### FIFTH CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW

### California Business and Professions Code § 17200 *et seq.*

### (Against All Defendants)

137.    Plaintiffs incorporate herein by this reference each and every allegation set forth above, as though fully set forth in this Cause of Action.

138.    California Business and Professions Code section 17200 *et seq.* ("Section 17200"), also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice as well as "unfair, deceptive, untrue or misleading advertising." *Id.* at §7203

139.    Bank of America's Defendants conduct was unlawful in that it violates California common law and violates TILA and Regulations Z, as alleged in this Complaint.

140.    Bank of America's acts and practices alleged herein constitute unfair business practices, including, without limitation, the following practices:

(a)    Failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs and its responsibilities under HAMP;

(b)    Failing to follow HAMP Guidelines, which are industry standard practice to determine whether to modify or foreclose securitized mortgages;

- 23 -

MERCER LEGAL

(c)     Failing to properly supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

(d)     Failing to permanently modify Plaintiffs' loans and/or provide alternative to foreclosure and using unfair means to keep Plaintiffs in temporary modification contracts, including, without limitations, routinely demanding information it already has and failing to communicate accurately or consistently with borrowers about the status of their loan modification applications;

(e)     Making inaccurate calculations and determinations of Plaintiffs' eligibility for permanent modifications; and

(f)     Engaging in acts and practices that prolong the HAMP process.

141.     Bank of America's acts and practices alleged herein constitute fraudulent business practices, including, without limitation, the following practices:

(a)     Bank of America has made misrepresentations and omissions of material fact that induced Plaintiffs to enter TPP contracts in order to obtain a permanent modification;

(b)     Bank of America has made and continues to make misrepresentations and omissions of material fact regarding the status of Plaintiffs' loan modification and loan payments;

(c)     Bank of America's misrepresentations and omissions are likely to deceive the reasonable consumer;

(d)     Bank of America's misrepresentations are objectively material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law; and

(e)     Plaintiffs reasonably and justifiably relied on such misrepresentations.

142.     The unlawful, unfair and fraudulent business practices of Defendants described herein present a continuing threat to Plaintiffs and will not cease doing so unless and until forced to stop by this Court.

MERCER LEGAL

- 24 -

143.    Defendants' conduct is causing and will continue to cause irreparable injury to plaintiffs unless enjoined or restrained.

144.    As a result of these violations and unlawful, unfair, and fraudulent business practices, Plaintiffs suffered injury in fact and lost money and property, including but not limited to, payment of increased interest, longer loan payoff times, higher principle balances, and payment of other charges collected by Bank of America.

145.    Pursuant to California Business and Professions Code section 17200 *et seq*., Plaintiffs are entitled to enjoin the practice of unfairly denying and failing to enter into permanent loan modifications for homeowners who have complied with the contractual obligations in Paragraph 1 of the TPP Contract, and grant such other and further relief as the Court may deem proper and just.

146.    As a direct and proximate result of defendants' unfair and deceptive business practices, Plaintiffs have been injured in fact and have lost money or property.

147.    As a direct and proximate result of defendants' unfair and deceptive business practices, defendants have been unjustly enriched and should be ordered to make restitution to Plaintiffs pursuant to Business and Professions Code sections 17203 and 17204.

WHEREFORE, plaintiffs pray for relief as set forth below.

### SIXTH CAUSE OF ACTION

### VIOLATIONS OF TILA AND REGULATION Z

### 15 U.S.C. §§ 1601 *et seq.*; 12 C.F.R. 226

### (Against All Defendants)

148.    Plaintiffs reallege each and every allegation above as if fully set forth in this Cause of Action.

149.    This consumer credit transaction was subject to the Plaintiffs' right of rescission under TILA, as described in 15 U.S.C. section 1635, and Regulation Z §226.23 (12 C.F.R. §226.23) ("In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions

- 25 -

MERCER LEGAL

1  described in paragraph (f) of this section"). The transaction that is the subject of this claim

2  resulted in a security interest acquired and retained by Bank of America in Plaintiffs' principal

3  dwelling thereby investing in Plaintiffs the right to rescind under TILA.

4      150.   In the course of this consumer credit transaction, Bank of America violated 15

5  U.S.C. §1635(a) and Regulation Z §226.23(b) by failing to deliver to Plaintiffs two copies of the

6  notice of the right to cancel that clearly and conspicuously disclosed the date the rescission period

7  expired. The notices of right to cancel that Plaintiffs received were materially defective in that

8  they did not indicate the final date to rescind the Loan.  (*See* the notices of right to cancel

9  received by Plaintiffs attached hereto as "**Exhibit 10**").

10     151.   Exhibit 10 contrasts sharply with the notices that were filed with the County Clerk

11  Recorder's Office, attached hereto as "**Exhibit 11**" and attached as "Exhibit D" to Defendants

12  Request for Judicial Notices filed July 13, 2011 (see Docket Entry Number 21).  Plaintiffs

13  objected the Notice of Right to Cancel provided to the Court by Defendants on the basis that

14  Bank of America did not provide Plaintiffs with Exhibit 11, but instead, provided Plaintiffs with

15  Exhibit 10 (see Docket Entry Number 24).  Plaintiffs did not see the Notice of Right to Cancel

16  attached hereto as Exhibit 11 until Bank of America produced it as an attachment to its Request

17  for Judicial Notice filed July 13, 2011 (some three and half years after Bank of America was

18  required to provide the proper notice under TILA).  Bank of America properly completed the

19  Exhibit 11 notice with the date of the rescission period expires (midnight December 22, 2007).

20  The dates handwritten on Exhibit 11 were placed on that notice sometime after Plaintiffs signed

21  the notice and were never provided to Plaintiffs.  Defendants' failure to provide these dates to

22  Plaintiffs is a violation of 15 U.S.C. §1635(a) and Regulation Z § 226.23(b) ("In a transaction

23  subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each

24  consumer entitled to rescind . . . The notice shall be on a separate document that identifies the

25  transaction and *shall clearly and conspicuously disclose the following: . . . (v) The date the*

26  *rescission period expires*")(emphasis added).

27     152.   Failure to provide the precise date the rescission period expires is a material

28  omission because of the complicated definition of "business day" under Regulations Z.

MERCER LEGAL

- 26 -

Regulation Z's general definition of "business day" includes only days when the creditor's offices are open to the public for business; but for the purposes of rescission "business day" includes every calendar day except Sundays and a list of legal public holidays.  Reg. Z § 226.2(a)(6) ("Business day means a day on which the creditor's offices are open to the public for carrying on substantially all of its business functions. However, for purposes of rescission under §§ 226.15 and 226.23, and for purposes of §§ 226.19(a)(1)(ii), 226.19(a)(2), 226.31, and 226.46(d)(4), the term means all calendar days except Sundays and the legal public holidays specified in 5 U.S.C. 6103(a), such as New Year's Day, the Birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, and Christmas Day").

153.   None of the exclusions of 15 U.S.C. section 1635(f) apply to Plaintiffs' case.  15 U.S.C. section 1635 does not apply, as explained in 15 U.S.C. section 1635(f), to the following:

(a)   "(1) a residential mortgage transaction as defined in section 103(w) [15 U.S.C. § 1602]" 15 U.S.C. § 1635(e)(1). 15 U.S.C. section 1602 defines a "residential mortgage transaction" as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to *finance the acquisition or initial construction of such dwelling*." 15 U.S.C. § 1602.  The transaction that is the subject of this claim was neither made to acquire nor to construct Plaintiffs' residence.  At the time of the transaction, Plaintiffs had already acquired the dwelling, which they maintained as their principal residence.  Therefore, the transaction that is the subject of this claim is a "refinancing."

(b)   "(2) a transaction which constitutes a refinancing or consolidation (with no new advances) of the principal balance then due and any accrued and unpaid finance charges of an existing extension of credit by the **same creditor** secured by an interest in the same property;" 15 U.S.C. § 1635(e)(2) (emphasis added).  Although the transaction that is the subject of this claim constitutes a refinancing,

- 27 -

MERCER LEGAL

1    the transaction involved **different creditors**, Wells Fargo Bank and Bank of

2    America respectively.  Therefore, the exclusion of 15 U.S.C. § 1635(e)(2) does not

3    apply to the facts of this case.

4    (c)    "(3) a transaction in which an agency of a State is the creditor; or" 15

5    U.S.C. § 1635(e)(3).  No state agencies acted as a creditor in the transaction that is

6    the subject of this claim.

7    (d)    "(4) advances under a preexisting open end credit plan if a security interest

8    has already been retained or acquired and such advances are in accordance with a

9    previously established credit limit for such plan." 15 U.S.C. § 1635(e)(4).  The

10   transaction that is the subject of this claim involved no advances under a

11   preexisting open end credit plan.

12   154.    Borrowers retain a continuing right to rescind a loan transaction until the third

13   business day after receipt of both the notice of the right to rescind as described herein and the

14   notice of all "material" disclosures as described herein, pursuant to 15 U.S.C. §1635(a) and

15   Regulation Z §226.23(a)(3). Plaintiffs have never received proper notices and, thus, retained the

16   right to rescind.

17   155.    Plaintiffs' November 23, 2010 notice of rescission with respect to the Loan was

18   valid and timely notice of rescission under applicable law.

19   156.    Defendant failed to accept Plaintiffs' valid notices of rescission in violation of 15

20   U.S.C. §1635, and Regulation Z §226.23.

21   157.    Defendant failed to take any action necessary or appropriate to reflect the

22   termination of any security interest created in connection with the Loan, including the security

23   interest described herein, as required by 15 U.S.C. §(b) and Regulation Z §23(d)(2).

24   158.    Defendant failed to return to Plaintiffs any money or property given by Plaintiffs

25   to anyone, including to Defendant, as required by 15 U.S.C. §1635(b) and Regulation Z

26   §226.23(d)(2).

27   159.    As a result of the violations by Defendant under TILA and Regulation Z, as

28   described herein, Plaintiffs are entitled to rescind the Loan transaction.

MERCER LEGAL

- 28 -

1    160.    As a result of the violations by Defendant under TILA and Regulation Z, as

2    described herein, Plaintiffs are entitled to terminate any security interest in the property created

3    under the loan transactions with Defendant, under 15 U.S.C. §1635 and Regulation Z §226.23. As

4    a result of the violations by Defendant under TILA and Regulation Z, as described herein,

5    Plaintiffs are entitled to the return of any money or property given by Plaintiffs to anyone,

6    including to Defendants, in connection with the Loan transaction with Defendants, under 15

7    U.S.C. §1635 and Regulation Z §226.23.

8    161.    As a result of the violations by Defendant under TILA and Regulation Z, as

9    described herein, Plaintiffs are entitled to retain proceeds to vest in Plaintiffs, under 15 U.S.C.

10   §1635 and Regulation Z §226.23.

11   162.    Plaintiffs are willing and able to repay any amounts due Defendant, after

12   Defendant has returned all amounts due to Plaintiffs, pursuant to a payment plan authorized by

13   the Court or in a lump sum with 120 days of an entry of order granting Plaintiffs rescission.

14   Alternatively, Plaintiffs are willing and able to return the entire property securing the loan to

15   Defendant, as tender in full after Defendant has returned all amounts due to Plaintiffs, as provided

16   by Reg. Z Section 226.23(d)(3) – 1.

17        WHEREFORE, plaintiffs pray for relief as set forth below.

18                           **PRAYER FOR RELIEF**

19        WHEREFORE, Plaintiffs prays for judgment against Defendants as follows:

20        1.    The Court grant a temporary restraining order preventing foreclosure of Plaintiffs'

21   property and prevent Defendants from making further harassing collection contacts;

22        2.    The Court enter preliminary and permanent injunctive relief preventing foreclosure

23   of Plaintiffs' property and prevent Defendants from making further harassing collection contacts;

24        3.    The Court enter a judgment declaring Defendants' acts and practices complained

25   of herein to constitute a breach of contract and a breach of the covenant of good faith and fair

26   dealing and to be unlawful, unfair, and fraudulent; as well as a declaration that Bank of America

27   is required by the doctrine of promissory estoppel to offer a permanent modifications to Plaintiffs;

28        4.    That this Court award Plaintiffs actual and statutory damages in an amount

MERCER LEGAL

MERCER LEGAL

1  according to proof for Defendants' breach of contract and breach of covenant of good faith and

2  fair dealing, and promissory estoppel, or in the alternative, that Defendant be ordered to make

3  restitution to Plaintiffs pursuant to California Business and Professions Code section 17203;

4       5.    The Court grant a permanent order enjoining Defendants' agents and employees,

5  affiliates and subsidiaries, from continuing to harm Plaintiffs from engaging in the unlawful,

6  unfair and fraudulent practices alleged herein and order specific performance of Defendants'

7  contractual obligations, under the TPP contracts, together with other relief required by contract

8  and law;

9       6.    The Court grant a permanent order enjoining Defendants' agents and employees,

10  affiliates and subsidiaries, from continuing to harm Plaintiffs from engaging in the unlawful,

11  unfair and fraudulent practices alleged herein and order statutory damages and attorneys fees;

12       7.    The Court issue a declaratory judgment that Defendant's actions have violated

13  federal Truth-in-Lending laws and, as a result, the security interest is void and that Plaintiffs are

14  entitled to rescission;

15       8.    The Court award Plaintiffs the costs of this action, including the fees and costs of

16  experts, together with reasonable attorney's fees, costs and expenses;

17       9.    The Court grant Plaintiffs such other and further relief as this Court finds

18  necessary and proper.

19                           Respectfully submitted,

20

21  Dated: December 27, 2011           MERCER LEGAL

22                           By:

23                           ERIC ANDREW MERCER

24                           Attorney for Plaintiffs

25

26

27

28

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of each and every claim so triable.

Dated: December 27, 2011                    MERCER LEGAL

                                            By: _____

                                                ERIC ANDREW MERCER
                                                Attorney for Plaintiffs

THIRD AMENDED COMPLAINT

MERCER LEGAL

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that this document filed through the ECF system will be sent electronically to the

3   registered participants as identified on the Notice of Electronic File (NEF) and paper copies will

4   be sent to those indicated as non-registered participants on December 27, 2011

5

6   Dated: December 27, 2011                    MERCER LEGAL

7                                              By: _____

8                                                  ERIC ANDREW MERCER
                                                   Attorney for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -